# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| MATTHEW KLINE, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>MIMEDX GROUP, INC., PARKER H. PETIT and MICHAEL J. SENKEN,<br><br>                    Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Matthew Kline ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by MiMedx Group, Inc. ("MiMedx" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by MiMedx; and (c) review of other publicly available information concerning MiMedx.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that acquired MiMedx's securities between March 7, 2013, and February 20, 2018, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    MiMedx purportedly provides regenerative biomaterial products and bioimplants processed from human placental tissue, skin, and bone.

3.    On October 23, 2017, First Analysis analyst Joseph Munda suspended

_____

[1] "Defendants" refers to MiMedx, Parker H. Petit and Michael J. Senken, collectively.

his price target for MiMedx, stating that the Company has been excluding First Analysis from asking questions on multiple calls while spending substantial time sparring with short sellers and filing lawsuits. The First Analysis report also noted that the number of unanswered questions is growing, and that First Analyst sees the stock price being more driven by regulatory and compliance factors than by fundamentals.

4.     On this news, the Company's stock price fell $2.60 per share over two trading sessions, almost 20%, to close at $11.30 per share on October 24, 2017, on unusually heavy trading volume.

5.     Then, on February 20, 2018, the Company issued a press release announcing the postponement of the release of financial results for the year ended December 31, 2017. The Company stated that, "The Audit Committee of MiMedx's Board of Directors has engaged independent legal and accounting advisors to conduct an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company. Company executives are also reviewing, among other items, the accounting treatment of certain distributor contracts."

6.     On this news, the Company's stock price fell nearly 40%, or $5.72 per share, to close at $8.75 per share on February 20, 2018, on unusually heavy trading

volume of over 20 million shares.

7.     On February 22, 2018, *Bloomberg.com* published an article detailing a litany of federal investigations into MiMedx's business practices.  The article, titled "U.S. Probes MiMedx's Federal Contracts, Accounting" asserts that the U.S. Department of Justice is investigating the Company's distribution practices, including whether MiMedx inappropriately booked sales of products that had not been ordered.  The *Bloomberg.com* article further stated that the SEC's enforcement division has been working with Federal prosecutors from the SEC's Denver office to investigate practices related to distributors.  The *Bloomberg.com* article also claimed that unidentified former employees was investigating whether MiMedx overcharged government customers in violation of the False Claims Act.

8.     Following the *Bloomberg.com* report, MiMedx stock traded as low as 22% below its opening share price for the day before recovering some of those losses.

9.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) MiMedx was engaged in a "channel-stuffing" scheme designed to inappropriately recognize revenue that had not yet been realized; (2)  that the

Company failed to employ proper compliance measures to ensure appropriate accounting practices; (3) that, as a result, the Company's internal controls over financial reporting were materially weak; (4) that, as a result, the Company's financial statements were inaccurate and misleading; and, (5) that, as a result of the foregoing, Defendants' statements about MiMedx's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

13.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

14.    Plaintiff Matthew Kline, as set forth in the accompanying certification, incorporated by reference herein, purchased MiMedx securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.    Defendant MiMedx is incorporated in Florida and the Company's corporate headquarters are located at 1775 West Oak Commons Court, NE Marietta, Georgia 30062. MiMedx operates as a medical device company that focuses on supplying biomaterials for soft tissue repair, in addition to other biomaterial-based products for other medical applications. The Company's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "MDXG."

16.    Defendant Parker H. Petit ("Petit") was the Chief Executive officer ("CEO") of MiMedx at all relevant times.

17.    Defendant Michael J. Senken ("Senken") was the Chief Financial officer ("CFO") of MiMedx at all relevant times.

18.    Defendants Petit and Senken (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of MiMedx's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

**Materially False and Misleading**
**Statements Issued During the Class Period**

19.    The Class Period begins on March 7, 2013.  On that day, MiMedx issued a press release announcing the financial and operating results for the period

ended December 31, 2012. The release, in pertinent part, stated as follows:

### Full Year and Fourth Quarter 2012 Results

The Company recorded record revenue for the year ended December 31, 2012, with revenue of $27.1 million, more than three times 2011 full year revenue of $7.8 million. Earnings before interest, taxes, depreciation, amortization, impairment of intangibles, earn-out liability and share based compensation (Adjusted EBITDA*) for the year ended December 31, 2012, were $2.4 million, a $8.7 million improvement as compared to the Adjusted EBITDA loss of $6.3 million for the year ended December 31, 2011.

The fourth quarter of 2012 marked the 8th consecutive quarter in which the Company reported improved gross margins. The Company's 2012 gross margins of 81% are nearly a forty-two percentage point improvement over full year 2011 gross margins of 57%.

The Company recorded record revenue for the quarter ended December 31, 2012, with revenue of $10.5 million, an increase of 299% or $7.9 million over fourth quarter of 2011 revenue of $2.6 million, and a 32% increase over the third quarter of 2012. Adjusted EBITDA* for the quarter ended December 31, 2012, were $411,000, a $2.1 million improvement as compared to the Adjusted EBITDA loss of $1.64 million for the quarter ended December 31, 2011.

20.    On March 15, 2013, MiMedx filed on Form 10-K with the SEC, its fourth quarter and annual financial results for the period ended December 31, 2012. The Company reported revenue of more than $27 million, as compared to

7

revenue of approximately $7.7 million for the same period in 2011. In the Form

10-K, the Company discussed its method for revenue recognition, stating:

> The Company sells its products primarily through a combination of independent stocking distributors and representatives in the U.S. and independent distributors in international markets. The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilized distributors or ships products directly to the end user, it recognizes revenue according to the shipping terms of the agreement provided all revenue recognition criteria have been met. A portion of the Company's revenue is generated from inventory maintained at hospitals or with field representatives. For these products, revenue is recognized at the time the product has been used or implanted. The Company records estimated sales returns, discounts and allowances as a reduction of net sales in the same period revenue is recognized.

21.    The Company's March 15, 2013 Form 10-K also assured investors of

the effectiveness of the Company's internal control over financial reporting:

> **Item 9A.    Controls and Procedures**
>
> **Disclosure Controls and Procedures**
>
> We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act. Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed by the Company in the reports filed under

the Exchange Act, such as this Annual Report on Form 10-K, is recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms. Our disclosure controls and procedures include controls and procedures designed to provide reasonable assurance that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and no evaluation of controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. Management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report on Form 10-K.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended). Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2012. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework. Our management has concluded that, as of December 31, 2012, our internal control over financial reporting is effective based on these criteria.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Also, projections of any evaluation of the effectiveness of internal controls over financial reporting to future periods are subject to the risk that the controls may become inadequate.

An evaluation was also performed under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of any changes in our internal control over financial reporting that occurred during our last fiscal quarter and that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. That evaluation did not identify any change in our internal control over financial reporting that occurred during our latest fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

> Cherry, Bekaert & Holland, L.L.P., an independent registered accounting firm, as auditors of our financial statements have issued an attestation report on the effectiveness of the Company's and its subsidiaries' internal control over financial reporting as of December 31, 2012. Cherry, Bekaert & Hollard, L.L.P.'s report is included in this report.

22.   The Company's March 15, 2013 Form 10-K was signed by Defendants Senken and Petit and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").

23.   On May 10 2013, MiMedx filed with the SEC its quarterly report on Form 10-Q for the three month period ended March 31, 2013. The Company reported revenue of more than $11.5 million, as compared to revenue of approximately $3.7 million for the same period in 2012. In the Form 10-Q, the Company discussed its method for revenue recognition disclosures substantially similar to those in ¶20, *supra*.

24.   MiMedx's May 10, 2013 Form 10-Q also assured investors of the effectiveness of the Company's internal control over financial reporting and was signed by Defendants Senken and Petit and contained SOX certifications.

25.   On August 8, 2013, MiMedx filed with the SEC its quarterly report on Form 10-Q for the three month period ended June 30, 2013. The Company reported revenue of more than $13.5 million, as compared to revenue of

approximately $4.8 million for the same period in 2012. In the Form 10-Q, the Company discussed its methods for revenue recognition disclosures substantially similar to those in ¶20, *supra*.

26.    On November 8, 2013, MiMedx filed with the SEC its quarterly report on Form 10-Q for the three month period ended September 30, 2013. The Company reported revenue of more than $16.1 million, as compared to revenue of approximately $7.9 million for the same period in 2012. In the Form 10-Q, the Company discussed its methods for revenue recognition disclosures substantially similar to those in ¶20, *supra*.

27.    MiMedx's November 8, 2013 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

28.    On March 4, 2014, MiMedx filed on Form 10-K with the SEC its full year and quarterly financial results for the periods ended December 31, 2013. The Company reported revenue of more than $59.1 million, as compared to revenue of approximately $27 million for the same period in 2012. In the Form 10-K, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

29.    MiMedx's March 4, 2014 Form 10-K further reported that distribution through its distribution agreement with AvKARE accounted for 56% of the

Company's total revenues. Specifically, the Company provided:

### Customer Concentration

We provide products to Government accounts, including the Veteran's Administration, through a distributor relationship with AvKARE, Inc., which is a veteran-owned General Services Administration Federal Supply Schedule Contractor. In 2013, sales to this distributor represented 56% of our revenues. The distribution agreement has a term of three years ending in April 2015, and has the potential to be extended for three additional one year terms. This distribution relationship is different than our other distribution relationships in that our direct sales force calls on Government accounts to generate orders for our products, which are placed directly with the distributor. Thus, if our agreement with this distributor was terminated for any reason, including because this distributor was no longer a Federal Supply Schedule Contractor, we believe we could retain or regain that business by contracting with another distributor to service these government accounts or becoming a General Services Administration Federal Supply Schedule Contractor ourselves. Nevertheless, any disruption in the inclusion of our products on the Federal Supply Schedule for any reason could materially and adversely affect our business, revenues and results of operations.

Another of our distributors represented an additional 10% of our total revenues in 2013. Our current distribution agreement with this distributor has a three year term, expiring in November 2015.

30. MiMedx's March 4, 2014 Form 10-K was signed by Defendants Senken and Petit and contained SOX certifications.

31.     On May 12, 2014, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended March 31, 2014. The Company reported revenue of more than $19.5 million, as compared to revenue of approximately $11.5 million for the same period in 2013. In the Form 10-Q, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

32.     MiMedx's May 12, 2014 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

33.     On August 11, 2014, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended June 30, 2014. The Company reported revenue of more than $25.5 million, as compared to revenue of approximately $13.5 million for the same period in 2013. In the Form 10-Q, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

34.     MiMedx's August 11, 2014 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

35.     On November 10, 2014, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended September 30, 2014. The Company reported revenue of more than $33.5 million, as compared to revenue of

approximately $16.1 million for the same period in 2013. In the Form 10-Q, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

36.    MiMedx's November 10, 2014 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

37.    On March 13, 2015, MiMedx filed on Form 10-K with the SEC its full year and quarterly financial results for the periods ended December 31, 2014. The Company reported revenue of more than $118.2 million, as compared to revenue of approximately $59.1 million for the same period in 2013. In the Form 10-K, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

38.    MiMedx's March 13, 2015 Form 10-K further reported that distribution through its distribution agreement with AvKARE accounted for 34% of the Company's total revenues. Specifically, the Company provided:

> **Customer Concentration**
>
> In 2014, we provided products to Government accounts, including the Department of Veteran's Affairs, through a distributor relationship with AvKARE, Inc., which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) Contractor. In 2014, sales to this distributor represented 34% of our revenues. The distribution agreement has a term of three years ending in April 2015, but provides a renewal clause for up to two

> successive terms of one year each following expiration of
> the initial term. In 2014, we applied for, and in early
> 2015 received, our own FSS contract with a term through
> 2020, which will allow us to sell directly to governmental
> accounts.

39.    MiMedx's March 13, 2015 Form 10-K was signed by Defendants Senken and Petit and contained SOX certifications.

40.    On May 1, 2015, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended March 31, 2015. The Company reported revenue of more than $40.7 million, as compared to revenue of approximately $19.5 million for the same period in 2014. In the Form 10-Q, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

41.    MiMedx's May 1, 2015 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

42.    On August 7, 2015, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended June 30, 2015. The Company reported revenue of more than $45.6 million, as compared to revenue of approximately $25.5 million for the same period in 2014. In the Form 10-Q, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

43.    MiMedx's August 7, 2015 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

44.    On November 6, 2015, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended September 30, 2015. The Company reported revenue of more than $45.6 million, as compared to revenue of approximately $25.5 million for the same period in 2014. In the Form 10-Q, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

45.    MiMedx's November 6, 2015 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

46.    On February 29, 2016, MiMedx filed on Form 10-K with the SEC its full year and quarterly financial results for the periods ended December 31, 2015. The Company reported revenue of more than $187.2 million, as compared to revenue of approximately $118.2 million for the same period in 2014. In the Form 10-K, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

47.    MiMedx's February 29, 2016 Form 10-K further reported that distribution through its distribution agreement with AvKARE accounted for 24% of the Company's total revenues. Specifically, the Company provided:

### Customer Concentration

The Company provides products to Government accounts, including the Department of Veteran's Affairs, through a distributor relationship with AvKARE, Inc. ("AvKARE"), which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) Contractor. In addition, in 2014, the Company applied for, and in early 2015 received, its own FSS contract with a term through 2020, which allows the Company to sell directly to Government accounts. The initial term of the distribution agreement with AvKARE was due to expire in April 2015 but it has been extended via amendment through June 30, 2017, with the ability to further extend under certain circumstances. The agreement with AvKARE, as amended, allows the Company to sell its products directly on the FSS. Ultimately, the Company intends to transition all of its Government sales to sales sold directly to Government accounts on the FSS. In 2015, sales to AvKARE represented approximately 24% of total revenue.

48. MiMedx's February 29, 2016 Form 10-K was signed by Defendants Senken and Petit and contained SOX certifications.

49. On May 10, 2016, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended March 31, 2016. The Company reported revenue of more than $53.3 million, as compared to revenue of approximately $40.7 million for the same period in 2015. In the Form 10-Q, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

50.    MiMedx's May 10, 2016 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

51.    On August 2, 2016, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended June 30, 2016. The Company reported revenue of more than $57.3 million, as compared to revenue of approximately $45.6 million for the same period in 2015. In the Form 10-Q, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

52.    MiMedx's August 2, 2016 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

53.    On November 8, 2016, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended September 30, 2016. The Company reported revenue of more than $64.4 million, as compared to revenue of approximately $49 million for the same period in 2015. In the Form 10-Q, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

54.    MiMedx's November 8, 2016 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

55.    On December 15, 2016, two former employees of MiMedx – Jess

Kruchoski and Luke Tornquist – filed a lawsuit in the United States District Court for the District of Minnesota (C.A. No. 16-cv-04171) against MiMedx and Petit (the "Whistleblower Lawsuit"). Among other things, that lawsuit put forward detailed allegations about a "channel-stuffing scheme" orchestrated by MiMedx and its executives to "fraudulently recognize revenue in its certified financial statements before the revenue had been realized or realizable and earned." This "channel-stuffing scheme," it was alleged, "implicates" MiMedx's distribution agreement with AvKARE, which permitted MiMedx to order certain products for delivery to VA hospitals. Because "[n]either AvKare nor the end customer—the VA—requests the" orders, and AvKare did not "exercise physical control over the product," MiMedex was allegedly able to claim orders that had not actually yet been filled as revenue to meet its forecasts.

56.    On March 1, 2017, MiMedx filed on Form 10-K with the SEC its full year and quarterly financial results for the periods ended December 31, 2016. The Company reported revenue of more than $245 million, as compared to revenue of approximately $187.2 million for the same period in 2015. In the Form 10-K, the Company discussed its method for revenue recognition, specifically regarding AvKARE, stating:

*Revenue Recognition*

The Company sells its products through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets. The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. The Company records revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment. Our stocking distributors are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products. Our stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error; however, in limited situations, we do accept returns or exchanges at our discretion.

Some of the Company's sales to Government accounts, including the Department of Veterans Affairs, are made through a distributor relationship with AvKARE, which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) contractor. The Company's agreement with AvKARE expires, subject to certain for-cause termination rights, on June 30, 2017. The Company may also elect to terminate the agreement without cause and pay a termination fee to AvKARE as specified in the agreement. Upon termination of the agreement, the parties may mutually agree to extend the agreement or the Company has an obligation to repurchase AvKARE's remaining inventory, if any, within ninety (90) days in accordance with the terms of

the Agreement. At the end of the term, the parties expect AvKARE's inventory to be minimal, based upon AvKARE's obligation to use commercially reasonable efforts to achieve target sales levels over the remaining term of the agreement.

We continually evaluate new and current customers, including our stocking distributors, for collectability based on various factors including past history with the customer, evaluation of their credit worthiness, and current economic conditions. We only record revenue when collectability is reasonably assured. A portion of the Company's revenue is generated from inventory maintained at hospitals or physician's offices.

We make estimates of potential future sales returns, discounts and allowances related to current period product revenue and these are reflected as a reduction of revenue in the same period revenue is recognized. We base our estimate for sales returns, discounts and allowances on historical sales and product return information, including historical experience and actual and projected trend information as well as projected sales returns based on estimated usage and contractual arrangements with AvKARE. These estimates have historically been consistent with actual results.

57.    MiMedx's March 1, 2017 Form 10-K was signed by Defendants Senken and Petit and contained SOX certifications.

58.    On May 1, 2017, the Company filed its quarterly report on Form 10-Q for the quarter ended March 31, 2017.  The Company reported revenue of more than $72.6 million, compared to approximately $53.3 million for the same period in 2016. In the Form 10-Q, the Company discussed its methods for revenue

recognition substantially similar to those in ¶20, *supra*.

59.    MiMedx's May 1, 2017 Form 10-Q also described the ongoing litigation with its two former employees, Jess Kruchoski and Luke Tornquist as follows:

> ### *Former Employee Litigation*
>
> On December 13, 2016, the Company filed lawsuits against former employees Jess Kruchoski (in the lawsuit styled MiMedx Group, Inc. v. Academy Medical, LLC, et. al. in the County Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida (the "Florida Action")) and Luke Tornquist (in the lawsuit styled MiMedx Group, Inc., v. Luke Tornquist in the Superior Court for Cobb County, Georgia, which was removed to the United States District Court for the Northern District of Georgia (the "Georgia Action")). Both the Florida and Georgia Actions assert claims against Messrs. Kruchoski and Tornquist that each of them violated their restrictive covenants entered into with the Company, that each of them misappropriated trade secrets of the Company, that each of them tortiously interfered with contracts between the Company and its customers and employees and that each of them breached his duty of loyalty owed to the Company, among other claims.
>
> On December 15, 2016, Messrs. Kruchoski and Tornquist filed a lawsuit in the United States District Court of Minnesota (the "Minnesota Action") against the Company and the Company's Chairman and Chief Executive Officer, Parker Petit. The plaintiffs in this lawsuit each claimed that their employment with the Company was terminated in retaliation for their complaints about the Company's alleged business

practices in violation of the Dodd-Frank Act, 15 U.S.C. § 78u-6(h); and was an unlawful discharge in violation of Minnesota Statutes Section 181.931 subdivision 1. Mr. Kruchoski also claimed that the termination of his employment with the Company constituted marital status discrimination and familial status discrimination in violation of the Minnesota Human Rights Act. Messrs. Kruchoski and Tornquist also claimed that Mr. Petit tortiously interfered with their employment relationships with the Company.

On January 26, 2017, the Company and Mr. Petit filed motions to dismiss the Minnesota Action. In response, Messrs. Kruchoski and Tornquist voluntarily dismissed the Minnesota Action without prejudice on February 7, 2017. On February 7, 2017, Mr. Tornquist filed his Answer and Counterclaims in the Georgia Action wherein he asserted claims similar to those he had asserted in the Minnesota Action, with the exception that he did not include a claim of tortious interference against Mr. Petit. On February 13, 2017, the Judge in the Georgia Action entered a Consent Order enforcing the restrictive covenants against Mr. Tornquist. On February 27, 2017, the Judge in the Florida Action entered a Consent Order enforcing the restrictive covenants against Mr. Kruchoski.

On February 15, 2017, Mr. Kruchoski filed a new lawsuit in Georgia against MiMedx and Mr. Petit, making many of the same allegations in that suit as were made in the Minnesota suit, with the addition of claims against the Company and Mr. Petit for defamation. In March, MiMedx and Mr. Petit both filed motions to dismiss Mr. Kruchoski's claims, which motions are currently pending, arguing, among other things, that the claims should be brought in the Florida Action.

On December 29, 2016, MiMedx also initiated an action against former employee Mike Fox in the United States District Court for the Northern District of Illinois alleging breach of contract with respect to his restrictive covenants, breach of his duty of loyalty, breach of his fiduciary duty and for the return of certain MiMedx property.

On December 30, 2016, MiMedx initiated a lawsuit against former employee Harold Purdy and his company, Recon Medical Devices, LLC in the Texas state district court for Dallas County alleging breach of Mr. Purdy's restrictive covenants, breach of Mr. Purdy's duty of loyalty, conspiracy to breach other employees' duties to MiMedx, tortious interference, and misappropriation of trade secrets. Mr. Purdy has a pending counterclaim against MiMedx alleging breach of contract.

The Company continues to vigorously pursue its claims asserted in all of these actions and also to vigorously defend against the lawsuits and counterclaims asserted against it.

60.    Notably, the Company's form 10-Q did not inform investors that Jess Kruchoski and Luke Tornquist had alleged that "[o]ver the course of their employment, Kruchoski and Tornquist discovered a fraudulent revenue recognition scheme orchestrated by MiMedx's executive leadership, including MiMedx's CEO, Parker Petit. MiMedx employed this fraudulently revenue recognition scheme to artificially inflate quarterly revenue and deceive investors."

61.    MiMedx's May 1, 2017 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

25

62.    On July 31, 2017, the Company filed its quarterly report on Form 10-Q for the quarter ended June 30, 2017.  The Company reported revenue of more than $76.4 million, compared to approximately $57.3 million for the same period in 2016. In the Form 10-Q, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

63.    MiMedx's July 31, 2017 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

64.    On August 10, 2017, MiMedx disclosed on Form 8-K that it had dismissed its long-time independent registered public accounting firm, Cherry Bekaert LLP, replacing the firm with Ernst & Young LLP.

65.    In early September, an investigative news company, The Capital Forum, issued a report stating that it had confirmed that "[t]he VA Office of Inspector General (OIG) is conducting an investigation that involves documents related to MiMedx." On September 7, 2017, MiMedx responded with a press release stating that it was not the subject of any such investigation. Specifically, the Company stated:

> MiMedx has been aware for some time of an ongoing investigation by the Department of Veterans Affairs ("VA") Office of Inspector General, but the Company is not a target of that investigation.  The Company is assisting with the investigation as requested by the government.  To the extent there has been any innuendo

> by The Capitol Forum or others that somehow MiMedx
> is a target, that is simply incorrect based on available
> information.

(emphasis in original).

66.    On September 20, 2017, two research groups often referred to as "short reporters" – Aurelius Value and Viceroy Research – published separate reports targeted at MiMedx detailing a number of red flags indicating potential fraudulent activity. For instance, the Aurelius Value report entitled "MiMedx: Flying Too Close To The Sun" summarized its findings as follows:

> We see large undiscounted channel stuffing and kickback
> risks lurking beneath the surface at MiMedx (NASDAQ:
> MDXG). This report specifically exposes:
>
> •    Undisclosed related party transactions and
> entanglements with distributors, including a key MiMedx
> distributor that has been controlled by an insider. These
> relationships are especially problematic because secret
> ties to distributors have featured prominently in historical
> channel stuffing schemes.
>
> •    Detailed allegations that MiMedx's channel
> stuffing scheme relies on at least three more distributors
> who have undisclosed special agreements involving
> millions in discounted product and favorable financing
> terms as "house accounts". Not only does the alleged
> scheme now extend significantly beyond the VA, but
> MiMedx has allegedly manipulated its financials through
> multiple avenues to hit sales targets.
>
> •    Documents showing that over 40 podiatrists across
> the country, including the current President of the

American Podiatric Medical Association, received undisclosed membership interests in a MiMedx reseller linked to MiMedx affiliates. The HHS Office of Inspector General has declared physician owned distributors as "inherently suspect" in a special fraud alert.

The research mosaic at MiMedx stirs memories of ArthroCare, a medical device company with a similar revenue recognition policy that inflated sales by "parking" millions in product at distributors before period ends. ArthroCare's fraud relied on a distributor secretly controlled by insiders, which metastasized alongside a scandal involving improper relationships with doctors.

67.    In response, MiMedx sued The Capital Forum in late September 2017 alleging, among other things libel, slander, and defamation. On October 4, 2017, MiMedx took the same tract with Aurelius Value and Viceroy Research, suing them in United States District Court for the Southern District of New York. Among other things, MiMedx labeled the allegations of "channel-stuffing" in the Aurelius Value and Viceroy Research reports (which rehashed claims by former employees made in the Whistleblower Lawsuit) as "false."

68.    On October 23, 2017, First Analysis analyst Joseph Munda suspended his price target for MiMedx, saying the Company had excluded First Analysis from asking questions on multiple calls while spending substantial time sparring with short sellers and filing lawsuits.  The First Analysis report claimed that the number

of unanswered questions was growing and asserted that MiMedx's increased stock price was driven by regulatory and compliance factors instead of fundamentals.

69.    On this news, the Company's stock price fell $2.60 per share over two trading sessions, almost 20%, to close at $11.30 per share on October 24, 2017, on unusually heavy trading volume.    Defendant, however, continued to conceal material facts which prevented the stock price from declining further.

70.    On October 26, 2017, the Company issued a press release entitled "MiMedx Announces Record Results For The Third Quarter Of 2017 And Raises Full Year Revenue Guidance."    Therein, the Company reported revenue for the 2017 third quarter of $84.6 million, a 31% increase over 2016 third quarter revenue. Further, Defendant Petit commented on the "short reporters" articles, stating as follows:

> "Along with our excellent third quarter operational results and the multiple advances we made in our clinical study initiatives, the third quarter marked significant progress in numerous other areas. We made significant headway in our legal actions defending our intellectual property and protecting against patent infringement. We successfully cleared all protracted hurdles put up by the defendants, and are now set for our first patent trial in January 2018. Also, we reached settlement in one and won many favorable judicial rulings in our other lawsuits against employees terminated for selling competitive products. Additionally, we have taken the appropriate legal actions against short sellers and others, and have taken steps to publically expose the coordinated scheme

> levied against the Company by these short sellers. We
> will not stand for the tortious interference and damage to
> the value of our shareholders' investment in MiMedx
> caused by the illegal actions of these short sellers and
> their 'free speech' shills," concluded Petit.

71.     On a conference call with investors to discuss the third quarter 2017

financial results, defendants continued to inform investors that there were no

accounting irregularities or revenue recognition errors, for instance in response to

questioning from analysts on the Company's compliance practices for authorized

distributors, Defendant Petit stated in relevant part:

> **\<Q - Matt O'Brien\>**: Thanks, and good morning.
> Thanks for taking my questions. Can we just kind of stick
> on some of these allegations that are running around out
> there a little bit more, and just given your interaction with
> the employees that you terminated, what have you
> learned from a compliance perspective to ensure that
> some of these issues don't persist going forward? And on
> the compliance processes side, what have you done to
> really ramp-up your assurances that there isn't anything
> nefarious going on, just anything you can provide as we
> kind of try to draw this whole thing out, I think would be
> helpful?

> **\<A - Parker H. Petit\>**: Okay. Well, first of all, from our
> standpoint, what was disappointing is us not finding out
> about to last – basically December about these sales from
> these individuals going onto to their own LLCs and own
> companies, that should have bubbled up to our
> compliance system, et cetera. A year prior to that, we had
> a situation develop where one of the managers out in the
> Midwest, it was bubbled up right through our compliance
> system, within 48 hours it was investigated and he was

terminated.

This situation, these individuals were a lot more shrewd than that particular individual. And I told people well, corporate knows about this, quote, unquote. Don't worry about it. Well, I just kind of kept it quiet for too long. So, we've done a lot of education and again in terms of what's proper, what is not proper. We can't – when you have 300 salespeople out there, you have 800 employees, somebody can go rogue on you and you just have to have a system set up that will highlight that quickly. We have two very efficient systems, if people would use them. We've used this as an example to all of the current people, particularly salespeople of what went wrong here and how off base it got, and how they must report this kind of misdoings or malfeasance quickly so we can deal with it.

So from that standpoint, this could have been a better learning experience, even though from a corporate standpoint, there's no malfeasance. We had some rogue employees. So we've learned a lesson and use that to, as a teaching moment as I used to call it with my children, is a teaching moment – broad teaching moment for all of our folks. But in terms of buttoning up systems here, we're in pretty doggone good shape, and three years ago we were too. Again, I refer right to the fact that we've gone through this drill once before. All the allegations made in that qui tam were basically these same allegations and we went through that with Department of Justice and came out within months and they didn't step into that case and the case was dropped. So, we're not naïve or not inexperienced in this area and we've got pretty doggone good systems. But are there going to be cases that can go off the ranch from time-to-time? Yes. But in terms of this company doing the right things, we know the regulations, we follow them, we educate, we get people to sign documents, they have been educated, but that doesn't

keep some individual from getting an idea and going off base with it.

We had a situation here in Atlanta called our attention a week or so ago and it turned out one of our salespeople here was trying to help a friend and he put his name on a corporation she was setting up. Well, there's nothing wrong with that, but when the short sellers locate that they try to make something out of it. Okay? We do not sell through [ph] PODs (56:29), period. All this stuff in Texas is just a lot of noise, but they'll dig up a name and they'll relate it through another social media matter and tie them together and say that's an indication of channel stuffing, or something else.

We will refute these things as we've been doing on our website when they've got some anywhere near merit to them and explain them quickly and move on. But it's gotten very noisy and it will continue to get noisy because these individuals are very focused on [indiscernible] (57:03) their notion and there is no corporate malfeasance here. And there are some little issues here and issues there that have cropped up, but I think from a corporate entity, we are doing everything we can. And the one thing that came out, by the way, the – three years ago, the OIG investigation, they recommended we add one more person to the compliance staff here, which we did. So, that's the status on that.

72.    On October 31, 2017, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2017.   The 10-Q reaffirmed the Company's statements about its financial results contained in the press release issued on October 26, 2017. In the Form 10-Q, the Company discussed its methods for revenue recognition substantially similar to those in ¶20, *supra*.

73.    MiMedx's October 31, 2017 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications.

74.    On November 9, 2017, in a public forum hosted by Canaccord Genuity, Defendant Petit stated that the Company was not engaged in any irregular revenue recognition practices and had compliance practices in place to prevent channel stuffing and other accounting errors, stating in relevant part:

> **<Q - Kyle William Rose>**: While I got you up here, I mean, I can't avoid the question of wanting to talk about some of the allegations and some of the back and forth that's going on in the stock this year with the company and then some groups of investors. So, there's been a lot of back and forth regarding improper sales practices, channel stuffing, sales [ph] to position on (14:45) distributors. I guess while you're here, how much of your business comes from PODs today or stocking distributors?
>
> **<A - Parker H. Petit>**: PODs is basically none that we know of. We've broadened those over the years. We sell to distributor and may have PODs roped in. We don't have the visibility, so we can't confirm that. But at the same time, distributors today are less than 5% of our business. Let me try to put into quick perspective this. I've dealt with short sellers for decades, last group with my last company.
>
> We had some aberrant things [ph] happen. We got them (15:26) closure and some months later, the company was acquired and they had a very bad day. We've encountered this time probably the most effective of all and it's been frustrating for us and frustrating for shareholders. However, these allegations have come from some sales

people we've terminated for cause back in December a year ago. They had set up and had a scheme to – a group [indiscernible] (15:54) come to us, ask us to eliminate their non-compete contract that we rolled out to them as a group. And by the way, if we didn't, they were going to allege malfeasance. Okay.

They never reported in this malfeasance up to our corporate systems and once we got into it, we realized they had already set up corporations, they were ready to go, they were selling competitive products. So...

\*\*\*

**<A - Parker H. Petit>**: ...to our customers. So, we brought them in, interviewed them. The ones that we ended up terminating sat there and lied to us in spite of us having gone to one of the manufacturers they were shipping product to and they gave us all the evidence we needed.

So, people that were dishonest with us, they've tied in with these short sellers and they're just creating information. We're trying to post and are posting on our website these allegations, they just keep coming. But most – all of them, when you look at, we've got 10 years of audited financial statements. We've got a big four auditing firm now.

We went through the board, went through a very serious lengthy litigation when these first allegations came up last December, did the things we're supposed to do. Brought in a revenue recognition expert. These people have no idea about business processes here. They've never seen the actual contract. They just keep throwing stuff out there with an email that has nothing to do with anything relating to their favorite word, channel stuffing.

You can't run a business like we've run it, have a cash flow we have and the strength of the balance sheet we have and do "channel stuffing" or any kind of

34

malfeasance, it's just not possible, so. But they are very artful at what they do, and over time here, we'll keep performing, and we'll get to an audit here shortly which should be number 11 and this soon will take care of itself.

75. On January 7, 2018, MiMedx issued a press release announcing preliminary fourth quarter and fiscal year 2017 financial results, reporting revenue of $324.5 million, a 32% increase over the same period in 2016. The release further forecasted first quarter 2018 revenue guidance of $90.5 to $92 million. Defendant Petit emphasized the higher than expected revenue and increasing growth prospects for 2018, stating, in pertinent part, as follows:

> The fourth quarter of 2017 makes 28 consecutive quarters of sequential revenue growth and 27 of 28 quarters of meeting or exceeding our revenue guidance. At the end of November, we expected we would exceed our revenue forecast for the quarter, as we indicated in our press release on November 30, 2017. We forecasted December to be a solid growth month, and our sales force more than lived up to our expectations with a robust month to close out the year. We are entering 2018 with strong momentum that should produce an exciting 2018.
>
> ***
>
> The fourth quarter was another quarter of very strong cash flow from operations. We are very pleased with the sustained progress we have made in this important measure of our operating effectiveness.
>
> We anticipate 2018 to be another year of highly predictable quarter over quarter revenue growth,

continued strengthening of our balance sheet and cash position, and significant gains in profitability. Shareholders should be reminded that the 2017 numbers reported in this press release are preliminary numbers based on management's best estimates, and we look forward to our planned press release on February 23, 2018 detailing our 2017 financial results. We also plan to host our standard live broadcast of our 2017 financial results on February 23, 2018.

76.    On January 18, 2018, MiMedx issued a press release entitled "MidMedx Comments on Magistrate Recommendation in the Company's Lawsuit Against Short Sellers." The release discussed the recommendation from the New York Magistrate that MiMedx's claims against some of the parties in the Company's lawsuit against various short sellers be dismissed. The release, in pertinent part, stated as follows:

In October 2017, MiMedx Group, Inc. and Sean McCormack brought a lawsuit in a New York federal court against various short sellers for defaming MiMedx and improperly trying to drive down its stock price. On January 16, 2018, the Magistrate in New York issued a recommendation that the claims against some, but not all, of the parties be dismissed. As the term "recommendation" suggests, this is not a final or binding order, but is merely a recommendation on how the District Court Judge should rule. Such recommendations are part of the litigation process, and the procedures allow either side to object to this recommendation to the District Court Judge and point out the errors of the Magistrate before any final ruling.

> The Company believes that the Magistrate's recommendations are in error, and therefore MiMedx will be filing objections with the District Court Judge. MiMedx believes that the District Court will reject the recommendations of the Magistrate and allow the litigation to proceed with the claims against all of the parties remaining intact. It is worth noting, however, that in the recommendation, the Magistrate's report did not find any of the statements made by the Defendants to be true. Further, the Magistrate specifically stated that the litigation and discovery should proceed to determine the identity of Viceroy Research, who had been hiding behind the veil of anonymity while defaming MiMedx and slandering its employees on virtually a daily basis. After this recommendation from the Magistrate, Viceroy in fact revealed its identity, indicating that it consisted of Fraser Perring, Gabriel Bernarde, and Aidan Lau.

77. The above statements above were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) MiMedx was engaged in a "channel-stuffing" scheme designed to inappropriately recognize revenue that had not yet been realized; (2) that the Company failed to employ proper compliance measures to ensure appropriate accounting practices; (3) that, as a result, the Company's internal controls over financial reporting were materially weak; (4) that, as a result, the Company's financial statements were inaccurate and misleading; and, (5) that, as a result of the foregoing, Defendants' statements about MiMedx's business, operations, and prospects, were false and misleading and/or

lacked a reasonable basis.

## THE TRUTH BEGINS TO EMERGE

78.     On February 15, 2018, short seller Aurelius Value published an article entitled "An Open Letter to the MidMedx Auditors" (the "Aurelius article"). The article, addressed to MiMedx's outside auditors, Ernst & Young ("EY"), includes allegations that there is "serious and pervasive fraud" within the Company. The article further expressed concerns that MiMedx "is using [EY's] brand as a means of conveying legitimacy to itself, especially since EY named [Defendant] Petit 'Entrepreneur Of The Year' in 2015."

79.     According to the Aurelius article, after MiMedx hired EY in August 2017, the Company immediately made statements implying that EY "endorsed MiMedx's accounting practices before even conducting an audit or issuing an audit opinion." For example, on October 26, 2017, the Company addressed a short seller report alleging improper practices and stated that "MiMedx has published our 3rd quarter financial results today. These exceptional results have been reviewed by our new auditors, who are one of the "Big Four" Auditing firms." However, in the Company's Form 10-Q filed on October 31, 2017, the filing explicitly states that the financial results are "unaudited." Further, on November 2, 2017, in response to another short seller's allegations concerning improper accounting practices,

Defendant Petit stated multiple times that the accusing short seller, as well as all investors, needed to "believe the auditors." These statements by Defendant Petit came just two short months after EY was hired by the Company and had not yet audited any of the Company's public filings.

80.    The Aurelius article contains further allegations regarding the independence of the Company's Board of Directors, whom Defendant Petit has stated is "a group of individuals that are very independent of this management group." However, Defendant Petit failed to disclose that J. Terry Dewberry, who has been a director since 2009 and is Chair of the Company's Audit Committee, is in fact his "little brother" from their fraternity days at Georgia Tech.

81.    Moreover, as stated in the Company's Form DEF 14A filed on April 13, 2017, Mr. Dewberry's entire employment history is intertwined with Defendant Petit. Mr. Dewberry served, at various times, as the President, Chief Operating Officer, Executive Vice President, and Vice Chairman of Defendant Petit's company, Healthdyne Inc. Mr. Dewberry was a director, at various times, on the board of Respironics Inc., Healthdyne Inc., Matria Healthcare Inc., Healthdyne Technologies, Inc., Home Nutritional Services, Inc., and Healthdyne Information Enterprises, Inc., all companies that were either founded or headed by Defendant Petit.

82.   The Aurelius article also alleges that MiMedx, through its primary Veterans Affairs distributor, AvKARE, has been "abusing [its] accounting policy] of recognizing revenue when it is distributed as opposed to when it is actually utilized by "hit[ting] sales targets by filling shelves before the end of quarters with excess product that neither AvKARE nor the VA had requested." The Aurelius article goes on to allege that "AvKARE was merely an intermediary and that MiMedx retained responsibility for the inventory." This allegation is supported by the deposition testimony of Michael Carlton, the Company's Vice President of Global Sales, in the case captioned *Mid South Biologics, LLC v. MiMedx Group, Inc.*, Civil Action No. 2:17-CV-02028-JTF-EGB. Mr. Carlton stated in his deposition that "AvKare didn't sell the product. They didn't do anything. They just made it easier to sell….it was really our guys that sold the product." Mr. Carlton's testimony directly contradicts Defendant Petit's statements on November 2, 2017, in which he stated that it was "just another [short seller] lie" that AvKARE was an intermediary.

83.   The AvKARE allegations are further confirmed by a transcript of a conversation between Steven Blocker, MiMedx's Area Vice President for the Central Area, and fellow employee Jess Kruchoski, in the case captioned *MiMedx Group, Inc. v. Fox*, Civil Action No. 1:16-CV-11715-MSS-SIS. The March 22,

2016 exchange, in pertinent part, is as follows:

**Blocker**: But I told Chris Cashman what's going to prevent me from doing [$3.7 million], you know – we were on a call. And I said what's gonna prevent me is par levels at certain hospitals, you know, warnings that come down by saying: Don't send this again, don't send this much again. People that don't have carte blanche at their facilities are starting to get, you know, questions.

**Kruchoski**: Right.

**Blocker**: And I don't want to do anything to jeopardize that. I said: There's still – still some instances where I'm free to do whatever I want. And I go: And certainly we'll look at those avenues moving forward, I says, but I don't have those same luxuries anymore. And [Chris Cashman's] response was: Well, do they have healing reviews down at those accounts?

**Kruchoski**: Come on.

**Blocker**: And I said I – and I said: Chris [Cashman] – I said: In all fairness – I said, you know: A healing review has no bearing on providing any extra shelf space or alleviating the concerns of some, you know, floor manager or department manager who's looking at how many grafts are spilling out of every cabinet available to us. I said: And what it helps with is when chief of surgery or chief of staff comes down and questions the amount of product that's being used, I go: That doesn't help us in any capacity for what's being, you know, stuffed in our VAs. So that –

**Kruchoski**: [Unintelligible.]

**Blocker**: – to me shows that they don't understand. So it's [Chris] Cashman and [Michael] Carlton. And, you

know, to a certain degree, you know, Bill [Taylor] has removed himself from it. So has Pete [Petit]. So it's pretty much direction from Cashman and Carlton given to Lou Roselli.

\*\*\*

**Kruchoski**: I don't – like, they realize, don't they, I think – they should, that the AvKARE number is not a real number. It's based on – they just don't get it. Like, I know they know this, but it's like what's driving them? Are they just so worried that we're not gonna hit that quarterly number and then what it's gonna do to the stock or – I don't get why it's such a – every single – every single quarter in the last three weeks of the quarter we get into this game. And then the sad part is, this is what I was saying about April, like, we're trying to chase a growing number – but trying to grow on a number that was built on false growth.

**Blocker**: Yeah.

\*\*\*

**Kruchoski**: What's the – what are they threatening to you if you don't hit that number? Is it just a respect issue? Is it –

**Blocker**: Nothing really. There's just an insinuation that there will be hell to pay. And, you know, Pete [Petit] says: Well, you don't want to be on the wrong end and not hit your number, you know. And I sit on a call, you know, Jess Kruchoski style. I said: Well, what happens if we don't hit our number, you know?

\*\*\*

**Kruchoski**: It's like we're – we're – we're throwing

down emails on what happened at ABH about how this is this, you know, [Osiris] is under investigation for this, but by the way, get those shelves stocked at the VA so that we can hit our number. It's just – it's such a hypocrisy that it's hard to – it's hard to get in line and go: Yeah, I'm excited about that. And I – and especially considering we're the ones that have to burn the political capital in front of the customer who goes into that closet every single day hopefully and says: What the hell is [unintelligible]?

84.     On February 20, 2018, MiMedx issued a press release announcing that it was postponing the release of its fourth quarter and fiscal year 2017 financial results due an Audit Committee investigation into the sales and distribution practices of the Company. The release stated as follows:

MiMedx Group, Inc., a leading developer and marketer of regenerative and therapeutic biologics, today announced that it will postpone the release of its financial results, as well as the filing of its Form 10-K, for the year ended December 31, 2017.

The Audit Committee of MiMedx's Board of Directors has engaged independent legal and accounting advisors to conduct an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company. Company executives are also reviewing, among other items, the accounting treatment of certain distributor contracts.

The Audit Committee is working closely with its advisors to complete this investigation in as timely a manner as possible. The Company will not be in a

position to release its financial results until the Audit Committee's internal investigation is completed.

The Company believes, based on information available to date, that the outcome of such investigation should not have a material impact on revenue guidance for 2018. The Company's unaudited cash and cash equivalents as of December 31, 2017 were approximately $33 million, after giving effect to the use of approximately $24 million for share repurchases in the fourth quarter of 2017 as part of the Company's Share Repurchase Program. The Company had no debt outstanding as of December 31, 2017. The Company also does not expect this delay to affect its operational performance and clinical research activities.

"Our Board of Directors and executives believe it is in the best interests of our Company and shareholders for our Audit Committee to address these allegations in an internal investigation with the support of independent legal and accounting advisors. We look forward to releasing our 2017 financial results as soon as this process is complete," said Parker H. "Pete" Petit, Chairman and CEO. "MiMedx has been experiencing rapid growth over the last few years as our product portfolio continues to meet significant, unmet needs in the marketplace. We are literally saving lives by saving limbs, and we expect to continue to deliver operational and clinical success in the months and years to come."

85.    On this news, the NASDAQ suspended all trading of MiMedx and the price of MiMedx stock plummeted more than 39% on February 20, 2018, falling from $14.47 per share on February 16, 2018 to close at $8.75 per share on February 20, 2018 on unusually high trading volume.

## POST-CLASS PERIOD DEVELOPMENTS

86.    On February 23, 2018, the Company hosted an earnings call with investors. Defendant Petit disclosed that the Company's Audit Committee had retained King & Spalding LLP and KPMG LLP to handle the independent investigation into the Company's sales and distribution practices. Defendant Petit further stated that revenue guidance remained unchanged. Defendants did not take questions from analysts during the brief call.

87.    Later that same day, The Wall Street Journal reported that MiMedx violated the 2013 Physician Payments Sunshine Act by failing to disclose payments the Company made to more than 20 doctors.

88.    On this news, the share price of MiMedx stock dropped another 11.8%, falling from $8.88 on February 22 to close at $7.83 on February 23.

89.    On February 26, 2018, Bloomberg reported that, in addition to the previously disclosed investigations, the U.S. Justice Department is also investigating whether MiMedx overcharged government customers for its products as well as investigating the Company's distribution practices. The article stated, in pertinent part, as follows:

> Bloomberg, citing two sources it says are familiar with
> the matter, reported that the U.S. Justice Department is
> investigating    whether    the    Marietta-based    company

overcharged government customers for its tissue-repair products. One employee told Bloomberg that Federal prosecutors are also looking into whether the company's tissue-graft sales violated the False Claims Act, which polices fraud against federal agencies

Investigators are also reportedly looking into MiMedx's distribution practices, including whether the company inflated its financials by booking sales of products that hadn't been ordered -- a practice known as channel stuffing.

Bloomberg reported that MiMedx said in a statement that it isn't aware of any Justice Department investigations.

The Wall Street Journal reported on Feb. 22 that MiMedx has financial ties to more than 20 doctors, but the company hasn't reported these payments to the government under a 2013 law. Read more on that here.

The company last week postponed releasing its fourth-quarter financial results, saying that independent legal and accounting advisers were conducting "an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company."

## CLASS ACTION ALLEGATIONS

90.     Plaintiff brings this action as a class action pursuant to Federal Rule of

Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and

entities that acquired MiMedx's securities between March 7, 2013 and February

20, 2018, inclusive, and who were damaged thereby (the "Class").  Excluded from

the Class are Defendants, the officers and directors of the Company, at all relevant

times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

91.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, MiMedx's common stock actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of MiMedx shares were traded publicly during the Class Period on the NASDAQ.  As of February 20, 2018, MiMedx had 111.03 million shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by MiMedx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

92.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

93.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class

and securities litigation.

94.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of MiMedx; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

95.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

96.    The market for MiMedx's securities was open, well-developed and efficient at all relevant times.    As a result of these materially false and/or misleading statements, and/or failures to disclose, MiMedx's securities traded at artificially inflated prices during the Class Period.    Plaintiff and other members of the Class purchased or otherwise acquired MiMedx's securities relying upon the integrity of the market price of the Company's securities and market information relating to MiMedx, and have been damaged thereby.

97.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of MiMedx's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about MiMedx's business, operations, and prospects as alleged herein.

98.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.    As described herein, during the Class Period, Defendants

made or caused to be made a series of materially false and/or misleading statements about MiMedx's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## **LOSS CAUSATION**

99.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

100.    During the Class Period, Plaintiff and the Class purchased MiMedx's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

101.  As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding MiMedx, their control over, and/or receipt and/or modification of MiMedx's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning MiMedx, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

102.  The market for MiMedx's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, MiMedx's securities traded at artificially inflated prices during the Class Period.  On August 22, 2017, the Company's stock price closed at a Class Period high of $17.34 per share.  Plaintiff and other

members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of MiMedx's securities and market information relating to MiMedx, and have been damaged thereby.

103.   During the Class Period, the artificial inflation of MiMedx's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.   As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about MiMedx's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of MiMedx and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

104.   At all relevant times, the market for MiMedx's securities was an efficient market for the following reasons, among others:

(a)    MiMedx stock met the requirements for listing, and was listed and

actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, MiMedx filed periodic public reports with the SEC and/or the NASDAQ;

(c)    MiMedx regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    MiMedx was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

105.   As a result of the foregoing, the market for MiMedx's securities promptly digested current information regarding MiMedx from all publicly available sources and reflected such information in MiMedx's stock price. Under these circumstances, all purchasers of MiMedx's securities during the Class Period suffered similar injury through their purchase of MiMedx's securities at artificially inflated prices and a presumption of reliance applies.

106.   A Class-wide presumption of reliance is also appropriate in this action

under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

107.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking

statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of MiMedx who knew that the statement was false when made.

<div align="center">

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

</div>

108.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

109.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase MiMedx's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

110.   Defendants (i) employed devices, schemes, and artifices to defraud;

(ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for MiMedx's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

111. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about MiMedx's financial well-being and prospects, as specified herein.

112. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MiMedx's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the

statements made about MiMedx and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

113.   Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

114. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing MiMedx's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

115. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of MiMedx's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in

which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired MiMedx's securities during the Class Period at artificially high prices and were damaged thereby.

116.   At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that MiMedx was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their MiMedx securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

117.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

118.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

119.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

120.   Individual Defendants acted as controlling persons of MiMedx within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

121.   In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the

power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

122.  As set forth above, MiMedx and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated:  February 26, 2018                    **HOLZER & HOLZER LLC**

                                        */s/* Corey D. Holzer
                                        Corey D. Holzer
                                        Georgia Bar # 364698
                                        Marshall P. Dees
                                        Georgia Bar # 105776
                                        Alexandria P. Rankin
                                        Georgia Bar # 949684
                                        1200 Ashwood Parkway, Suite 410
                                        Atlanta, GA 30338
                                        Telephone: (770) 392-0090
                                        Facsimile: (770) 392-0029

                                        **GLANCY PRONGAY & MURRAY LLP**
                                        Lionel Z. Glancy
                                        Robert V. Prongay
                                        Charles H. Linehan
                                        1925 Century Park East, Suite 2100
                                        Los Angeles, CA 90067
                                        Telephone: (310) 201-9150
                                        Facsimile: (310) 201-9160

                                        *Counsel for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows **- List additional transactions on Schedule A, if necessary**:

Purchases:

| Ticker of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| MDXG | 2/14/18 | 650 | 15.98 |

Sales:

| Ticker of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| MDXG | 2/20/18 | 650 | 9.29 |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

no

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __21__ day of __Feb__, 2018 in _____Acton_____, _____MA_____.
                                                                    City                State

(Signature) X_____

(Print Name)_____Matthew Kline_____
                              First                    Last